IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **Elizabeth Badolato, Ph.D.,** | ) |
| **Plaintiff,** | ) |
| | ) Civil Action, Case No. _____ |
| v. | ) |
| | ) **JURY DEMANDED** |
| **The University of Tennessee,** | ) |
| **Defendant** | ) |

## COMPLAINT

**COMES NOW** the Plaintiff, Elizabeth Badolato, Ph.D. ("Dr. Badolato" and/or "Plaintiff"), by and through undersigned counsel, and for her Complaint against the University of Tennessee ("UT" and/or "Defendant"), states as follows:

### NATURE OF THE COMPLAINT

1. This is a case for wrongful termination, hostile work environment, breach of contract, and retaliation based on Defendant's ongoing harassment and treatment of Dr. Badolato throughout her employment with Defendant based on her outspokenness on unfair payment practices and her engagement in protected activities of reporting the harassment and hostile work environment.

2. Defendant allowed Dr. Badolato to be harassed, discriminated against, and retaliated against based on her informal complaints of unfair payment practices, and based on her formal complaints of harassment and hostile work environment created by the provost of University of Tennessee Southern.

3. Defendant refused to renew Dr. Badolato's appointment as a tenure-track professor because of her informal and formal complaints surrounding perceived violations of federal law, in complete

violation of the outlined and agreed to procedures for termination found in the UT Faculty Handbook.

4. Defendant's conduct violates Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, T.C.A. § 4-21-401(a).

## JURISDICTION AND VENUE

5. Plaintiff is an adult resident of Limestone County, Alabama.

6. Defendant University of Tennessee is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses throughout Tennessee, in particular University of Tennessee, Southern, located in Giles County, Tennessee.

7. The University of Tennessee is an instrumentality of the State of Tennessee and is administered by the UT Board of Trustees.

8. The University of Tennessee can be served with legal process c/o Jonathan Skrmetti, Attorney General, State of Tennessee, Office of the Attorney General and Reporter, P.O. Box 20207, Nashville, Tennessee 37202. Counsel for the University of Tennessee have agreed to waive service, with service being completed via email to rpowel26@utk.edu and mfitzge8@utk.edu. A copy of the Waiver of Service shall be filed.

9. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) and/or in the alternative, 28 U.S.C. § 1391(b)(2) because, *inter alia*, UT resides in the Nashville Division of the U.S. District Court in the Middle District of Tennessee, is subject to the Court's personal jurisdiction, all events or omissions occurred at UT's University of Tennessee Southern branch in Giles County, and

Plaintiff cannot receive a fair and impartial jury in any other judicial district in which venue would be proper.

11. At All times relevant to the complaints herein, Defendant was an employer as contemplated under Title VII, 42 U.S.C. § 2000e(b) and the Tennessee Human Rights Act, T.C.A. § 4-21-102(5).

**FACTUAL BACKGROUND**

12. Dr. Badolato initially began working as an instructor in August of 2019 and was promoted to full-time assistant professor for Martin Methodist College ("MMC") on or about August 14, 2020.

13. Dr. Badolato's qualifications include a Ph.D. in English and a M.S. in physics.

14. At some point in July of 2021, MMC was absorbed into the UT system, and renamed University of Tennessee Southern ("UTS").

15. On or about September 9, 2021, Dr. Badolato's employment was renewed, and her employment was categorized as a tenure track professor.

16. Dr. Badolato was on tenure track as an English professor, but taught physics classes as well to assist the science department in its teacher shortage.

17. Dr. Badolato's appointment as a tenure track professor was subsequently renewed in 2022, 2023, and 2024.

18. As an academic professor, Dr. Badolato was required to teach twelve (12) hours each semester.

19. In addition to her professor role, Dr. Badolato also served as a Program Coordinator, Lab Coordinator, Academic Advisor, and Faculty Fellow.

20. Because of her role as Program Coordinator, Dr. Badolato received a course credit of three (3) hours, which she was allowed to utilize in either the spring or fall semesters.

21. If an instructor exceeds their hourly requirement, they are entitled to 'overload pay' for those additional courses—the academic equivalent of over-time pay.

22. The policy and/or procedure in place requires a set pay for overload courses; it also provides that the UTS may cancel the course if there is insufficient enrollment, or, in the alternative, negotiate an agreed upon decreased rate with the professor. (*See* **Exhibit 1 –** Overload Contract for Fall 2024, ¶ 2).

23. Dr. Badolato exercised her course credit for the spring semester of 2025 and was only required to teach nine (9) hours.

24. However, in the spring semester, Dr. Badolato was scheduled to teach ten (10) hours, exceeding her nine (9) hour requirement.

25. Because of this overload, Dr. Badolato expected to receive an overload contract for the Spring 2025 semester similar to Exhibit 1.

26. On or about January 13, 2025, overload contracts were dispersed, and Dr. Badolato did not receive one.

27. Dr. Badolato underwent significant steps to determine the cause of not receiving an overload contract. On or about January 24, 2025, Dr. Badolato was informed that the provost did not calculate her as having an overload due to the enrollment in the course which placed her in overload, and she would not be receiving overload pay.

28. This was clearly contradictory to the policy and procedures of UTS, as Dr. Badolato was indeed working beyond the required hours. There were no attempts to comply with the policy and/or procedure of cancelling the class or negotiating a reduced overload rate with Dr. Badolato.

29. Due to the fact that she would not be paid what she was entitled to under the policy, Dr. Badolato made reasonable attempts to communicate with the provost and resolve this inequal pay dispute.

30. Despite her efforts, Dr. Badolato's requests to meet and confer regarding the overload issue were ignored.

31. At this point and time, Dr. Badolato could have either worked additional hours without additional compensation, in contradiction of UTS' policy for overload, or she could switch her course to a directed study in order to reduce her courseload to match the pay she was receiving.

32. Dr. Badolato elected the latter option, and only after electing the latter option did she receive a meeting with the provost, Dr. Prentice Chandler ("Dr. Chandler") on January 31, 2025.

33. During this January meeting, Dr. Badolato met with Dr. Chandler and other staff. During this meeting, Dr. Chandler was progressively hostile with Dr. Badolato, accusing her of violations of policy, continuously demeaning her, and telling her that if she is unhappy at UTS then she should leave. The overall message received from this meeting was that she should continue teaching the classes as previously proscribed, and despite teaching beyond the required courseload she would not be entitled to any additional overload pay.

34. Immediately following this meeting, Dr. Badolato was required to attend a Curriculum and Academic Polices committee meeting. Dr. Chandler was also in attendance at this meeting.

35. Before the close of the committee meeting, Dr. Chandler wanted to discuss a "funny" story about a recent rumor he had heard. He went on to explain that faculty members believed they could change their course modalities unilaterally.

36. Because this was the topic of the conversation in which Dr. Chandler and Dr. Badolato had just had, it was clear that Dr. Chandler's statement was directed at Dr. Badolato and was made with

5

Case 3:25-cv-01280    Document 1    Filed 11/04/25    Page 5 of 17 PageID #: 5

the intent to cause her undue duress and create a hostile and uncomfortable environment for Dr. Badolato.

37. The statements by Dr. Chandler in front of colleagues and faculty caused Dr. Badolato to feel intimidated, offended, and harassed, and the statements interfered with her ability to attend future committee meetings due to the fear of further similar actions by Dr. Chandler.

38. On or about February 3, 2025, Dr. Chandler confirmed one (1) hour of overload pay due to Dr. Badolato teaching beyond her required courseload.

39. Just three (3) minutes after confirming her overload pay, Dr. Chandler followed up with a summary of the January 31 meeting, wherein he categorized the conversation as relating to Dr. Badolato's "unsatisfactory performance in teaching and [her] failure to comply with a 'lawful directive from the [provost].'" Within the summary, Dr. Chandler miscategorized Dr. Badolato's handling of her course, failed to include the concerns she raised regarding not being paid for additional work, and attempted to imply that her performance in teaching was ever called into question—which it was not.

40. Over the next month and a half, Dr. Badolato continued to face hostility, intimidation, offensive and demeaning behavior from Dr. Chandler that interfered with her work performance.

41. Dr. Badolato made numerous requests with Human Resources in an attempt to resolve this issue. Human Resources informed Dr. Badolato there was nothing she could do regarding the behavior and attempted to prevent Dr. Badolato from filing a formal complaint.

42. On or about February 13, 2025, in a meeting with Dr. Badolato, Dr. Chandler, and other faculty, Dr. Chandler refused to acknowledge Dr. Badolato's presence—even when she was speaking during the meeting—and when he chose to discuss her to the other members at the

meeting, his tone was hostile and aggressive, with the intent of intimidating and offending Dr. Badolato.

43. Due to the continued and pervasive nature of the harassment she was subjected to, on or about March 20, 2025, Dr. Badolato filed a complaint with Human Resources regarding Dr. Chandler's harassment.

44. Despite the clear allegations within the complaint regarding a hostile work environment and harassment, Human Resources analyzed the complaint under a theory of sexual harassment and summarily dismissed the complaint on or about April 29, 2025.

45. The dismissal letter did not indicate an investigation was ever conducted and alleged that Dr. Badolato—the complainant—was the one engaged in unprofessional and disrespectful conduct toward Dr. Chandler.

46. Upon information and belief, the lack of investigation and the comments made by Human Resources, coupled with their initial attempt to prevent Dr. Badolato from filing a complaint, stem from Human Resources relationship and/or friendship with Dr. Chandler.

47. On May 15, 2025, less than two (2) months after filing a complaint against Dr. Chandler, and just three (3) months before the start of the 2025-26 academic year, Dr. Badolato received a letter from Dr. Chandler titled "Non-Renewal of Probationary Appointment" (hereinafter referred to as the "Termination Letter") (*See* **Exhibit 2 –** Non-Renewal Letter).

48. This Termination Letter unequivocally states that Dr. Badolato's appointment would not be renewed after the 2024-25 academic year. The Termination Letter goes on to state that Dr. Badolato's 2025-26 academic appointment will be honored, despite clear indication just a few sentences prior that her appointment will not be renewed after the 2024-25 academic year.

7

Case 3:25-cv-01280     Document 1     Filed 11/04/25     Page 7 of 17 PageID #: 7

49. In fact, there was no 2025-26 appointment to be honored—Dr. Badolato never signed a new agreement and was expressly told that her appointment would not be renewed after the 2024-25 academic year.

50. Because of the contradictory statements within the Termination Letter, Dr. Badolato made numerous efforts to receive clarification from the Chancellor and Human Resources regarding the letter and the state of her employment, and Dr. Badolato received no response or clarification. The only additional information Dr. Badolato received from Human Resources was that the legal department would not help her with clarification.

51. The lack of a response and the surrounding circumstances, including a colleague stating six (6) days before she received the letter that he was sad to see her go, led Dr. Badolato to the reasonable conclusion that her termination was effective at the end of the 2024-25 academic year, and the fact she had not received an appointment renewal contract meant she would not be returning for the 2025-26 academic year.

52. UTS policy found in the UTS Faculty Handbook, § 2.3.1.2.5(c) (and referring to UT System Policy BT0006, III.E) states:

> "**Notice that a tenure-track faculty member's appointment will not be renewed for the next year** shall be made in writing by the chief academic officer, upon the recommendation of the department head and dean, a according to the following schedule:
> a. In the first year of the probationary period, not later than March 1 for an academic year appointment and no less than three months in advance for any other term of appointment;
> b. In the second year of the probationary period, not later than December 15 for an academic year appointment and no less than six months in advance for any other term of appointment; and
> c. In the third and subsequent years of the probationary period, **not less than twelve months in advance**."

UTS Faculty Handbook, § 2.3.1.2.5(c) (emphasis added) (*See* **Exhibit 3** – UTS Faculty Handbook, p. 17).[1]

53. As Dr. Badolato was in her fourth year of her probationary period, she was not only entitled to but was required to be provided twelve (12) months advance notice that her employment would not be renewed for the next year.

54. Instead, Dr. Badolato only received three (3) months advance notice that her appointment would not be renewed for the following academic year.

55. Further, Dr. Badolato was on tenure-track within the English department. As such, the policy requires the department head for Arts and Humanities and the Dean recommend Dr. Badolato for non-renewal.

56. According to the Termination Letter, the department head for Arts and Humanities abstained, and there was no indication whether the Dean for Arts and Humanities recommended non-renewal.

57. Because the procedural requirements for non-renewal were not abided and Dr. Badolato's appointment was non-renewed in blatant disregard of the policy, Dr. Badolato perceived the actions of Dr. Chandler to be in retaliation for her prior complaint against him less than two (2) months prior.

58. Before filing this suit, Dr. Badolato attempted to resolve the matter informally through a demand letter, which included a preservation of evidence clause.

59. Dr. Badolato had been informed by sources at UTS that shortly after she received her Termination Letter, UTS removed Dr. Badolato's name from the directory within the science

---

[1] Dr. Badolato understands the entire handbook is not necessary for purposes of citing to the specific applicable section, but she is providing the entirety of the Faculty Handbook in effect for 2024-25 academic year for purposes of satisfying the requirements for pleading breach of contract. § 2.3.1.2.5(c) can be found on page 17.

building, indicating UTS intended the Termination Letter to be effective after the 2024-25 academic year.

60. Shortly after UTS received the demand letter, UTS placed Dr. Badolato's name back onto the directory in the science building, in violation of the preservation of evidence clause within the demand letter.

61. Dr. Badolato filed an inquiry with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about May 18, 2025, filed an EEOC Charge on August 14, 2025, and received her Right to Sue letter on August 22, 2025.

62. On or about September 10, 2025, Dr. Badolato was informed she would be terminated once more, effective September 30, 2025, for 'job abandonment,' despite already being terminated and her appointment not being renewed beyond the 2024-25 academic year.

63. As a result of Defendant's actions, Dr. Badolato has suffered loss of income and benefits, as well as embarrassment, emotional harm, and anxiety, including the need to seek therapy and medication for same. Dr. Badolato has also incurred significant attorney fees associated with the filing of this suit.

### COUNT I – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e), et seq.

64. Dr. Badolato incorporates by reference the allegations contained in paragraphs 1 through 62 as if fully set forth herein.

65. Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits retaliation against employees for engaging in protected activities such as reporting concerns of discrimination or harassment. 42 U.S.C. § 2000e-3(a).

66. In order to establish a claim under Title VII, a plaintiff must prove that: (1) she engaged in a protected activity; (2) the exercise of the protected activity was known to the employer; (3) the

10

Case 3:25-cv-01280  Document 1  Filed 11/04/25  Page 10 of 17 PageID #: 10

employer thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Circ. 2000). Close temporal proximity between a protected activity and a material adverse action are sufficient to establish causation. *Allen v. McPhee*, 240 S.W.3d 803, 823 (Tenn. 2007).

67. Dr. Badolato's complaints about unpaid wages and harassment constituted protected activity.

68. Here, Dr. Badolato engaged in two (2) protected activities. First, she raised concerns regarding unequal and/or unfair compensation practices. Second, she raised concerns regarding harassment and a hostile work environment.

69. The exercise of these protected activities was known by Defendant, as indicated by Dr. Chandler's meeting with Dr. Badolato and by receipt and alleged investigation of Dr. Badolato's formal complaint.

70. After Dr. Badolato engaged in the first protected activity, she was retaliated against by further harassing, demeaning, and hostile actions and treatment by Defendant.

71. After Dr. Badolato engaged in the second protected activity, she was terminated less than two (2) months later.

72. The failure to comply with the policy and the close temporal proximity between the latter protected activity and her termination satisfies the causation requirement.

73. But for the protected activity, Dr. Badolato would not have been improperly terminated, or in the alternative would have been given proper notice of her termination in compliance with the policy governing termination of a tenure-track faculty member.

74. Further, the failure to comply with the policy in place indicates the decision to terminate Dr. Badolato's employment was not a neutral action, but instead an action made in retaliation by a provost who was upset regarding Dr. Badolato's complaint.

75. Defendant violated Title VII when it retaliated against Dr. Badolato because she raised complaints and concerns regarding unpaid wages and harassment.

76. Defendant further violated Title VII when it terminated Dr. Badolato, for a second time, after she engaged the EEOC.

77. Defendant's actions constitute illegal retaliation in violation of Title VII, which damaged Dr. Badolato, and therefore Dr. Badolato demands:

   a. Compensatory damages;

   b. Punitive damages;

   c. Costs and attorneys' fees;

   d. Accrual of back pay and front pay, including fringe benefits; and

   e. Any other such relief that this Court deems just and proper.

### COUNT II – RETALIATION IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT, Tenn. Code Ann. § 4-21-301

78. Dr. Badolato incorporates by reference the allegations contained in paragraphs 1 through 77 as if fully set forth herein.

79. The Tennessee Human Rights Act ("THRA") mirrors the analysis for retaliation as Title VII.

80. An employee must show: (1) they engaged in activity protected by the THRA; (2) the exercise of their protected rights were known to the employer; (3) the employer took a materially adverse action against the employee; and (4) there was a causal connection between the protected

activity and the adverse action. *Lin v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2008-00212-COA-R3-CV,, at *8-9 (Ct. App. Oct. 10, 2008).

81. Dr. Badolato engaged in protected activity under the THRA when she spoke out regarding unfair pay practices and when she formally submitted a complaint against Dr. Chandler for harassment and a hostile work environment.

82. The exercise of these protected activities were known to Defendant, as indicated by Dr. Chandler's meeting with Dr. Badolato, and by receipt and alleged investigation of Dr. Badolato's formal complaint.

83. After Dr. Badolato engaged in the first protected activity, she was retaliated against by further harassing, demeaning, and hostile actions and treatment by Defendant.

84. After Dr. Badolato engaged in the second protected activity, she was terminated less than two (2) months later.

85. The failure to comply with the policy and the close temporal proximity between the latter protected activity and her termination satisfies the causation requirement.

86. But for the protected activity, Dr. Badolato would not have been improperly terminated, or in the alternative would have been given proper notice of her termination in compliance with the policy governing termination of a tenure-track faculty member.

87. Further, the failure to comply with the policy in place indicates the decision to terminate Dr. Badolato's employment was not an official action, and was instead an action made in retaliation by a provost who was upset regarding Dr. Badolato's complaint.

88. Defendant violated THRA when it retaliated against Dr. Badolato because she raised complaints and concerns regarding unpaid wages and harassment.

89. Defendant further violated THRA when it terminated Dr. Badolato, for a second time, after she engaged the EEOC.

90. Defendant's actions constitute illegal retaliation in violation of THRA, which damaged Dr. Badolato, and therefore Dr. Badolato demands:

   a. Compensatory damages;

   b. Punitive damages;

   c. Costs and attorneys' fees;

   d. Accrual of back pay and front pay, including fringe benefits; and

   e. Any other such relief that this Court deems just and proper.

## COUNT III – BREACH OF CONTRACT

91. Dr. Badolato incorporates by reference the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92. In order to show a prima facie case for breach of contract, a plaintiff must show: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach of the contract; and (3) damages caused by the breach of the contract. *Whitworth v. City of Memphis*, 689 S.W.3d 579, 584 (Tenn. Ct. App. 2023).

93. The Faculty Handbook and promises contained therein constituted a valid and enforceable contract between Defendant and Dr. Badolato.

94. The express terms of the Faculty Handbook ensure that a tenure track employee of Dr. Badolato's level shall be provided twelve (12) months advance notice that their appointment will not be renewed for the following academic year. (Exhibit 3, p. 17).

95. Dr. Badolato was only given three (3) months advance notice that her appointment would not be renewed after the 2024-25 academic year.

96. Because she was only given three (3) months notice instead of the required twelve (12) months, Defendant did not abide by its duties outlined in the Faculty Handbook in non-renewing Dr. Badolato's appointment.

97. This action amounts to a breach of the contract.

98. Because Dr. Badolato was provided notice just three (3) months before the end of the 2024-25 academic year and wrongfully terminated in violation of the Faculty Handbook, she was damaged and therefore demands:

   a. Compensatory damages;

   b. Punitive damages;

   c. Costs and attorneys' fees;

   d. Accrual of back pay and front pay, including fringe benefits; and

   e. Any other such relief that this Court deems just and proper.

## COUNT IV – NEGLIGENCE

99. Dr. Badolato incorporates by reference the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100. To establish a prima facie case of negligence, a plaintiff must show: (1) a duty of care owed by the defendant to the plaintiff; (2) failure on the part of the defendant to perform that duty; and (3) an injury to the plaintiff resulting proximately from the defendant's breach of that duty. Concklin v. Holland, 138 S.W.3d 215, 220 (Tenn. Ct. App. 2003).

101. Here, Defendant owed a duty to Dr. Badolato and all professors to abide by the rules and regulations surrounding overload course pay and non-renewal of appointments. Defendant also had a duty to investigate claims of harassment and hostile work environments appropriately.

102. Defendant breached its duty when it failed to pay Dr. Badolato for overload, despite her working more hours than required.

103. Defendant breached its duty when it failed to comply with the Faculty Handbook procedures regarding notices of non-renewal and termination of a tenure-track professor when it wrongly terminated Dr. Badolato's employment.

104. Defendant breached its duty when it failed to properly investigate Dr. Badolato's formal complaint and instead analyzed the complaint under a theory of sexual harassment, which was summarily dismissed.

105. Each of these breaches of Defendant's duties were reasonably foreseeable to cause Dr. Badolato harm, particularly in the form of lost wages, emotional harm, and loss of benefits.

106. But-for Defendant's breaches, Dr. Badolato would not have suffered the harm she has suffered.

107. Because Defendant breached the duties it owed to Dr. Badolato, she was damaged and therefore demands:

    a. Compensatory damages;

    b. Punitive damages;

    c. Costs and attorneys' fees;

    d. Accrual of back pay and front pay, including fringe benefits; and

    e. Any other such relief that this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Badolato prays this Honorable Court for Judgment against Defendant in an amount of not less than $500,000 for compensatory damages, punitive damages, attorneys' fees and costs of this action, equitable relief (including accrual of back pay and front pay, and fringe

benefits), damages based on humiliation and embarrassment suffered, and any other relief this Honorable Court deems just and proper to award.

## DEMAND FOR JURY TRIAL

Dr. Badolato demands a trial by jury for any and all issues so properly tried.

Respectfully Submitted, this 4th day of November, 2025.

**MONTGOMERY, LITTLE & SORAN, P.C.**

_____
Hunter Martin, TN Bar No. 041395
5445 DTC Parkway, Suite 800
Greenwood Village, CO 80111
(303) 773-8100 (voice)
(303) 220-0412 (fax)
hmartin@montgomerylittle.com

*Attorney for Plaintiff*